

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 2-09-096-CR

LUCKY LAMON ODOM                                            APPELLANT

V.

THE STATE OF TEXAS                                                STATE

------------

FROM THE 297TH DISTRICT COURT OF TARRANT COUNTY

------------

## MEMORANDUM OPINION[1]

------------

In six points that all challenge either the sufficiency or admission of the evidence against him, appellant Lucky Lamon Odom appeals his conviction for capital murder.  We affirm.

------------

[1] *See* Tex. R. App. P. 47.4.

## Background Facts

On the afternoon of August 19, 1982, Tommy Stone, who at that time was a Fort Worth Police Department crime scene investigator, was called to an elementary school located near residential housing on West Seventh Street in Fort Worth. When Stone arrived, he saw another officer who directed him to Kathryn Munroe's dead body. The body was starting to decompose, had some insect bites, and was unclothed except for an unbuttoned black shirt. Munroe was a student at the Texas College of Osteopathic Medicine (TCOM) and lived near the college on West Seventh Street with another TCOM student, Jacqueline Tuttle, about a hundred yards from where the body was found.

Stone began to take photographs and notes of what he saw; for instance, Stone discovered panties in a sandy playground area that he measured as being seventy-two feet away from Munroe's body.[2] Stone stayed at the scene for about an hour and collected evidence (including the panties) in paper sacks.

Tarrant County Chief Medical Examiner Dr. Nizam Peerwani, a certified pathologist who is responsible for determining the cause of suspicious deaths, went to the crime scene and examined Munroe's body. At the scene and later in his laboratory, Dr. Peerwani found and concluded, among other things, the following:

- Munroe had a darkened, swollen face, which had hemorrhages that were consistent with strangulation;

---

[2] Another officer reported that the panties were twenty-five feet north of the body. Later DNA testing confirmed that Munroe had worn the panties.

- she had scratches on her neck that may have occurred from her attempt to release a strangler's grip;

- she had hemorrhaged muscles, including a hemorrhage of the lining of the left carotid artery that could have been caused by applying pressure to her neck;

- her lungs were congested and her brain was swollen, and "both of these are part and parcel of the picture of strangulation";

- she had recent scrapes along her vaginal cavity and an abrasion on her clitoris with a "profuse amount of white watery fluid in the vaginal canal" that looked like semen discharge;

- the large amount of white watery fluid was deposited into Munroe's vagina "at or near the time of her death and had not been discharged," which indicated to Dr. Peerwani that Munroe had sexual intercourse prior to her death; and

- Munroe's body had lain in its location at the school between eight and twenty-four hours before it was found.[3]

Dr. Peerwani collected vaginal and anal smears and swabs from Munroe,[4] samples from her pubic and scalp hair, a sample of her cardiac blood, and her fingernail clippings from both hands, which showed signs consistent with her trying to remove a perpetrator's hands. Dr. Peerwani did not examine Munroe's panties. The next

---

[3] Dr. Peerwani testified at trial, "So all and all, all of this was consistent with a strangulation. . . . And so the most consistent findings were associated with a manual strangulation." Dr. Peerwani defined manual strangulation as one caused by a strangler's bare hands, and he gave a detailed explanation about how death occurs when someone is strangled, including his opinion that "one has to apply consistent pressure for three to five minutes before a person really will suffer a brain death."

[4] Dr. Peerwani testified, "The vaginal smear is collected by inserting a sterile Q-tip into the vaginal canal . . . . And then the swab is then smeared on a dry glass slide in a circular motion. And then the glass slide is air-dried."

3

day, Tommy Reed, who was also a crime scene investigator, went to Munroe's house; Reed collected two partial fingerprints of poor, unusable quality from a doorknob and did not see any evidence of forced entry or other apparent disarray.

The police investigated Munroe's murder for many years—through interviews of males who may have dated Munroe and conversations with residents of the area where the school was located, among other individuals—but the murder remained unsolved. However, in 2003, the Fort Worth Police Department began a process to take DNA from the evidence that had been gathered in 1982 from Munroe's body, send it off for testing to Orchid Cellmark (a private company), and then upload the DNA profile results that were obtained from Orchid Cellmark into a Combined DNA Indexing System (CODIS).[5]

In 2007, CODIS informed the department that there was a match between the unknown DNA profile taken from Munroe's body and a DNA sample taken from appellant, who was living in Florida. The department then obtained warrants in Texas and in Florida and gained another DNA sample from appellant through a swab from the inside of his cheek. The department took that swab, along with

---

[5] The department originally sent a blood swatch, a cutting from Munroe's panties that had semen on it, and a vaginal swab to Orchid Cellmark. Orchid Cellmark uses polymerase chain reaction (PCR) testing to create an individual's DNA profile. Orchid Cellmark did not test many of the items discovered around Munroe's body in 1982, including her black shirt. Appellant has not contended on appeal that there are any particular deficiencies in Orchid Cellmark's general testing procedures or in the specific results that the company obtained related to this case.

Munroe's fingernail cuttings, blood swatches, and a vaginal smear, to Orchid

Cellmark for further testing. Orchard Cellmark's testing revealed the following:

- Munroe's fingernail cuttings from her right hand had DNA from more than one person but not enough DNA to link to any specific individual;

- the vaginal smears and swabs contained a male's sperm fraction profile;[6]
- the DNA profile obtained from the sperm found inside Munroe's body matched the DNA profile obtained from appellant in 2007, and the odds of finding that complete "profile in the population is one in 53.76 quadrillion";[7] and

- the testing of Munroe's panties revealed DNA from more than one individual, including an unknown male, and appellant was excluded as a contributor to the DNA on the panties.

A Tarrant County grand jury indicted appellant for capital murder; the

indictment alleged that appellant killed Munroe by strangling her with his hands while

in the course of committing aggravated rape. After appellant pled not guilty and the

State presented its evidence at trial, a jury convicted appellant. He received

imprisonment for life as his punishment. He filed a motion for new trial and notice

of this appeal.

## Evidentiary Sufficiency

---

[6] Appellant theorized at trial that more than one male's DNA profile could have been found from Munroe's vaginal swabs and smears, but the testimony from Orchid Cellmark's representative, Matthew Quartaro, does not support this theory. Quartaro specifically testified that he found "a sperm cell fraction which was consistent with Lucky Odom," not that he found more than one sperm cell fraction.

[7] The department excluded three specific individuals from being contributors to the biological samples that were found in Munroe's body.

5

In his first two points, appellant argues that the evidence is legally and factually insufficient to support his capital murder conviction.

**Standards of review**

In reviewing the legal sufficiency of the evidence to support a conviction, we view all of the evidence in the light most favorable to the prosecution in order to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). This standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Clayton*, 235 S.W.3d at 778.

The trier of fact is the sole judge of the weight and credibility of the evidence. *See* Tex. Code Crim. Proc. Ann. art. 38.04 (Vernon 1979); *Brown v. State*, 270 S.W.3d 564, 568 (Tex. Crim. App. 2008), *cert. denied*, 129 S. Ct. 2075 (2009). Thus, when performing a legal sufficiency review, we may not re-evaluate the weight and credibility of the evidence and substitute our judgment for that of the factfinder. *Dewberry v. State*, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999), *cert. denied*, 529 U.S. 1131 (2000). Instead, we "determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict." *Hooper v. State*, 214 S.W.3d 9,

16–17 (Tex. Crim. App. 2007). We must presume that the factfinder resolved any conflicting inferences in favor of the prosecution and defer to that resolution. *Jackson*, 443 U.S. at 326, 99 S. Ct. at 2793; *Clayton*, 235 S.W.3d at 778. The standard of review is the same for direct and circumstantial evidence cases; circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor. *Clayton*, 235 S.W.3d at 778; *Hooper*, 214 S.W.3d at 13.

When reviewing the factual sufficiency of the evidence to support a conviction, we view all the evidence in a neutral light, favoring neither party. *Steadman v. State*, 280 S.W.3d 242, 246 (Tex. Crim. App. 2009); *Watson v. State*, 204 S.W.3d 404, 414 (Tex. Crim. App. 2006). We then ask whether the evidence supporting the conviction, although legally sufficient, is nevertheless so weak that the factfinder's determination is clearly wrong and manifestly unjust or whether conflicting evidence so greatly outweighs the evidence supporting the conviction that the factfinder's determination is manifestly unjust. *Steadman*, 280 S.W.3d at 246; *Watson*, 204 S.W.3d at 414–15, 417. To reverse under the second ground, we must determine, with some objective basis in the record, that the great weight and preponderance of all the evidence, although legally sufficient, contradicts the verdict. *Watson*, 204 S.W.3d at 417.

Unless we conclude that it is necessary to correct manifest injustice, we must give due deference to the factfinder's determinations, "particularly those determinations concerning the weight and credibility of the evidence." *Johnson v.*

7

*State*, 23 S.W.3d 1, 9 (Tex. Crim. App. 2000); *see Steadman*, 280 S.W.3d at 246. Evidence is always factually sufficient when it preponderates in favor of the conviction. *Steadman*, 280 S.W.3d at 247; *see Watson*, 204 S.W.3d at 417.

**Applicable law and analysis**

To review appellant's evidentiary sufficiency points, we will apply the penal statutes that were in effect in 1982 (the time of Munroe's murder). *See Villarreal v. State*, 286 S.W.3d 321, 323 n.1 (Tex. Crim. App.), *cert. denied*, 130 S. Ct. 515 (2009); *Ex parte Richardson*, 70 S.W.3d 865, 867 n.4 (Tex. Crim. App. 2002); *see also Ex parte Cole*, 43 S.W.3d 713, 715 (Tex. App.—Fort Worth 2001, no pet.) (explaining that if a law became effective after a defendant committed an offense and altered the evidence required to convict the defendant, the law would be an unconstitutional ex post facto law). In 1982, a person committed capital murder when the person committed murder while in the course of committing aggravated rape. *See* Act of May 28, 1973, 63rd Leg., R.S., ch. 426, art. 2, § 1, 1973 Tex. Gen. Laws 1122, 1123 (amended 1983) (current version at Tex. Penal Code Ann. § 19.03 (Vernon Supp. 2009)). Murder could be committed by intentionally or knowingly causing an individual's death or by intending to cause serious bodily injury and committing an act clearly dangerous to human life that caused the individual's death. *Id.* (murder statute amended 1993) (current version at Tex. Penal Code Ann. § 19.02 (Vernon 2003)).

In 1982, aggravated rape occurred when a person committed rape while causing serious bodily injury or while attempting to cause death. *See* Act of May 12, 1981, 67th Leg., R.S., ch. 202, § 1, sec. 21.03(a)(1), 1981 Tex. Gen. Laws 471, 471, *repealed by* Act of May 29, 1983, 68th Leg., R.S., ch. 977, § 12, 1983 Tex. Gen. Laws 5311, 5321. Rape occurred when someone had sexual intercourse with a female who was not his wife without the female's consent. *See* Act of May 24, 1973, 63rd Leg., R.S., ch. 399, § 1, sec. 21.02, 1973 Tex. Gen. Laws 883, 916, *repealed by* Act of May 29, 1983, 68th Leg., R.S., ch. 977, § 12, 1983 Tex. Gen. Laws 5311, 5321.[8]

The trial court's jury charge substantially tracked the language of these statutes. Thus, the charge asked the jury to determine whether appellant intentionally strangled Munroe to death with his hands while in the course of committing or attempting to commit aggravated rape (in other words, whether he strangled her to death while having or attempting to have nonconsensual sexual intercourse with her and while either causing or attempting to cause death or serious bodily injury). *See* Act of May 12, 1981, 67th Leg., R.S., ch. 202, § 1, sec. 21.03(a)(1), 1981 Tex. Gen. Laws 471, 471 (repealed 1983).

The evidence presented at trial demonstrates the following:

- Munroe was not married;

---

[8] Instead of rape and aggravated rape, the penal code now has offenses for sexual assault and aggravated sexual assault. *See* Tex. Penal Code Ann. §§ 22.011, 22.021 (Vernon Supp. 2009).

- Munroe was manually strangled to death despite her attempt to get away from her attacker;

- a violent, nonconsensual sexual encounter occurred contemporaneously with the strangling because Munroe's body was found almost completely unclothed, she had recent injuries to her vagina, and she had a "profuse amount" of white watery fluid in her vagina that, according to Dr. Peerwani's conclusion, had not been discharged and had therefore been deposited at or near the time of her death;[9]

- appellant's sperm was found inside of Munroe's deceased body, and that finding is significant because Dr. Peerwani indicated that if Munroe had moved around after having sexual intercourse, semen would have discharged outside of her vaginal area; and

- although he lived in Florida in 2007, in either 1981 or 1982, appellant lived with his then-wife, Beatrice Birdtrial, on Wingate Street in Fort Worth, only a mile and a half to two miles away from West Seventh Street (where the school was located), and he had access to transportation at that time.

We conclude that when viewed in the light most favorable to the prosecution, this evidence (including the reasonable inferences that may be drawn from the evidence) could allow a rational jury to conclude beyond a reasonable doubt that appellant intentionally killed Munroe while committing aggravated rape against her. Thus, we hold that the evidence is legally sufficient to support his capital murder conviction. *See Hinojosa v. State*, 4 S.W.3d 240, 245 (Tex. Crim. App. 1999) ("Despite one in 19,900,000 odds, appellant's DNA profile matched the semen found in the victim. .

---

[9] During his testimony, Dr. Peerwani specifically affirmed that the injuries to Munroe's vagina and the other injuries that he discovered occurred contemporaneously with her death.

10

. . [T]hese impressive statistics support the jury's conclusion that appellant . . . sexually assaulted, kidnapped, and killed [the victim]."); *Prince v. State*, 192 S.W.3d 49, 53, 59–60 (Tex. App.—Houston [14th Dist.] 2006, pet. ref'd) (concluding that the evidence was sufficient to support the appellant's capital murder conviction because, among other facts, DNA from blood samples collected at the crime scene matched the appellant's DNA); *King v. State*, 91 S.W.3d 375, 379–81 (Tex. App.—Texarkana 2002, pet. ref'd); *see also Neighbors v. State*, No. 02-07-00176-CR, 2008 WL 2404437, at *3–4 (Tex. App.—Fort Worth June 12, 2008, pet. ref'd) (mem. op., not designated for publication) (holding that DNA evidence collected by police after a robbery that matched an individual through CODIS provided legally and factually sufficient evidence of the appellant's identity as the robber). We overrule apppellant's first point.

Similarly, viewing the evidence in a neutral light, we conclude that it is not so weak that the jury's determination is clearly wrong and manifestly unjust and that conflicting evidence does not so greatly outweigh the evidence supporting the conviction that the jury's determination is manifestly unjust. *See Steadman*, 280 S.W.3d at 246. As to evidence that might possibly conflict with the jury's guilty verdict, the record shows that some of the items collected by the police on the day that Munroe's body was discovered may have been lost by the Fort Worth Police Department. However, these lost items had been examined in the department's crime lab and had been determined to have no evidentiary value.

11

Next, Munroe's panties contain a male's DNA that does not match appellant's DNA. But the jury could have reasonably found that the unknown male's DNA connects to a sexual encounter unrelated to Munroe's murder because the evidence does not establish that any male's DNA other than appellant's DNA was found inside of Munroe's body and the panties were found a significant distance away from Munroe's body, which indicates that her rape occurred away from the panties. Alternatively, the jury might have surmised that someone else assisted appellant in raping and murdering Munroe, which would not affect appellant's guilt. *See Wilson v. State*, 185 S.W.3d 481, 485 (Tex. Crim. App. 2006) ("Even if there was another person who aided appellant and has successfully evaded prosecution after all these years, it would have no effect whatsoever on appellant's conviction and sentence.").

Finally, appellant attempts to cast doubt on the jury's verdict because he notes that Dr. Tuttle (Munroe's roommate at the time of the murder) testified that within a couple of months after the murder, a male whose voice she did not recognize called her unlisted telephone number and told her that she "better behave or [she] would be next." At trial, appellant's counsel argued that this testimony shows that Munroe's killer knew Munroe and Dr. Tuttle. Dr. Tuttle testified that she did not know appellant.

However, the record does not preclude the possibility that appellant knew Munroe and Dr. Tuttle (either before or after the murder occurred)—even though Dr. Tuttle did not know him—and that he somehow obtained Dr. Tuttle's telephone

12

number and made the call. The record also does not establish that the male who made the call is necessarily the same person who committed Munroe's murder. Thus, the jury could have reasonably concluded that Dr. Tuttle's testimony about the phone call does not outweigh the remaining evidence—including the DNA evidence—that links appellant to Munroe's rape and murder.

For these reasons, we conclude that under the relevant standards, the evidence is not too weak to support the jury's verdict and the evidence that may conflict with the verdict is not strong enough to outweigh it. *See Steadman*, 280 S.W.3d at 246; *Watson*, 204 S.W.3d at 414–15, 417. Thus, we hold that the evidence is factually sufficient and overrule appellant's second point.

### Rule 403 Objections

In his third through sixth points, appellant contends that the trial court abused its discretion by admitting several items of evidence over his rule 403 objections. Rule 403 of the rules of evidence provides, "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence." Tex. R. Evid. 403. "Probative value" refers to how strongly evidence serves to make more or less probable the existence of a fact of consequence to the litigation coupled with the proponent's need for that item of evidence. *Gigliobianco v. State*, 210 S.W.3d 637, 641 (Tex. Crim. App. 2006). "Unfair prejudice" refers to a tendency to suggest a

13

decision on an improper basis, commonly, though not necessarily, an emotional one.

*Id.*

When a rule 403 objection is made and overruled at trial, we review a trial court's decision to admit evidence under an abuse of discretion standard. *Reese v. State*, 33 S.W.3d 238, 240–41 (Tex. Crim. App. 2000). In doing so, we may consider the following factors, among others: (1) the probative value of the evidence, (2) the potential of the evidence to impress the jury in some irrational, but nevertheless indelible way, (3) the time the proponent needs to develop the evidence, and (4) the proponent's need for the evidence. *Id.* at 240–41.

The rules of evidence favor the admission of relevant evidence and carry a presumption that relevant evidence is more probative than prejudicial. *Jones v. State*, 944 S.W.2d 642, 652 (Tex. Crim. App. 1996), *cert. denied*, 522 U.S. 832 (1997). When determining whether evidence is admissible under rule 403, we do not consider whether the evidence is more prejudicial than probative; instead, we consider whether the probative value is substantially outweighed by the danger of unfair prejudice. *Garcia v. State*, 201 S.W.3d 695, 704 (Tex. Crim. App. 2006), *cert. denied*, 549 U.S. 1224 (2007). Our highest criminal court has observed that we should rarely reverse a trial court's judgment under rule 403. *Mozon v. State*, 991 S.W.2d 841, 847 (Tex. Crim. App. 1999). As long as the trial court's ruling is within the zone of reasonable disagreement and is correct under any theory of law

14

applicable to the case, it must be upheld. *Winegarner v. State*, 235 S.W.3d 787, 790 (Tex. Crim. App. 2007).

**Crime scene and autopsy photographs**

In points three and four, appellant complains about the trial court's admission of two crime scene photographs of Munroe's body and two autopsy photographs of her face. He succinctly asserts that these photographs "did no more than to inflame the jury in sympathy for the State."

In reviewing the admissibility of photographs taken from a murder scene, the court of criminal appeals recently stated,

> A court may consider many factors in determining whether the probative value of photographs is substantially outweighed by the danger of unfair prejudice. These factors include: the number of exhibits offered, their gruesomeness, their detail, their size, whether they are in color or black-and-white, whether they are close-up, whether the body depicted is clothed or naked, the availability of other means of proof, and other circumstances unique to the individual case. The admissibility of photographs over an objection is within the sound discretion of the trial judge.

*Williams v. State*, 301 S.W.3d 675, 690 (Tex. Crim. App. 2009) (citations omitted). Because the photographs in *Williams* "had probative value in that they depicted both the crime scene and the victim's injuries" and because they "portrayed no more than the gruesomeness of the injuries inflicted" by Williams, the court of criminal appeals held that the trial court did not abuse its discretion by admitting the photographs. *Id.* at 692 (citing *Narvaiz v. State*, 840 S.W.2d 415, 429–30 (Tex. Crim. App. 1992), *cert. denied*, 507 U.S. 975 (1993)).

Similarly, in another case styled *Williams v. State*, the court of criminal appeals discussed the same factors as those quoted above and affirmed the trial court's decision to admit photographs under the following reasoning:

> The two photographs about which appellant complains are each approximately eight by ten inches in size. One shows the clothed upper half of the victim's body in the position she was found and the other shows the victim after she was rolled over onto a what appears to be a bodybag by investigators at the scene. The first photograph depicts the body and the surrounding area as they were originally seen by investigators. Some of the injuries inflicted upon the victim can be seen from this angle. The second photograph better shows the different injuries and the extent of the damage inflicted upon the victim. Both photographs are somewhat gruesome, primarily due to the amount of blood depicted. However, they are no more gruesome than the facts of the offense itself.
>
> While the appearance of a bodybag in the second photograph might be somewhat prejudicial, any prejudice caused does not substantially outweigh the probative value of the photograph. Further, because these photos are few in number, depict the wounds inflicted upon the victim, the relative location and position in which she was discovered, and were the subject of testimony at trial, their probative value is not substantially outweighed by their possible prejudicial effect.

958 S.W.2d 186, 196 (Tex. Crim. App. 1997) (citations and footnote omitted); *see Shuffield v. State*, 189 S.W.3d 782, 788 (Tex. Crim. App.) (holding similarly), *cert. denied*, 549 U.S. 1056 (2006); *Orr v. State*, 306 S.W.3d 380, 402 (Tex. App.—Fort Worth 2010, no pet.) (affirming the trial court's decision to admit four moderately-sized photographs because they were probative of the decedent's injuries and were "no more gruesome than would be expected").

The four photographs that appellant complains about in points three and four appear in the record in black and white and fill a letter-sized sheet of paper. The

16

State did not need a significant amount of time to develop the evidence relating to any of the photographs.

Appellant challenges the admission of State's exhibits four and five in his third point. State's exhibit four shows Munroe's mostly unclothed body (with part of one breast visible), which was lying in the grass, from a medium-distance side angle with Munroe facing the opposite direction from which the picture was taken. It does not expressly depict her injuries, and it does not show her pubic area. State's exhibit five shows Munroe's almost naked body (including her breasts and pubic area) from a medium-distance aerial-type view and depicts some of her injuries, although her face in the photograph is dark and difficult to see.

These exhibits provide context to Stone's description of the crime scene, and they therefore have probative value. *See Williams*, 301 S.W.3d at 692; *Frank v. State*, 183 S.W.3d 63, 78 (Tex. App.—Fort Worth 2005, pet. ref'd) (explaining that crime scene photographs "were helpful to the jury because they provided a visual context for [two detectives'] testimony"); *see also Jones*, 944 S.W.2d at 652 ("We have consistently held that photographs are generally admissible where verbal testimony about the same matters is admissible."). While the exhibits show Munroe's unclothed body, they are not excessively bloody, they are no more gruesome than the crime itself, and they depict a true representation of the discovery that the officers made in 1982, which supports the State's theory of the rape. Thus, the trial court could have reasonably determined that neither of State's exhibits four or five

17

is inflammatory enough to create unfair prejudice that substantially outweighs probative value.

Therefore, we hold that the trial court did not abuse its discretion by overruling appellant's rule 403 objection to State's exhibits four and five. *See Reese*, 33 S.W.3d at 240–41. We overrule his third point.

In his fourth point, appellant complains about the trial court's decision to admit State's exhibits nine and ten, which are photographs from Munroe's autopsy. "Autopsy photographs are generally admissible unless they depict mutilation of the victim caused by the autopsy itself." *Williams*, 301 S.W.3d at 690 (citing *Santellan v. State*, 939 S.W.2d 155, 172 (Tex. Crim. App. 1997)). State's exhibit nine shows a close-up image of Munroe's darkened face with hemorrhages and fluid running from her nose and mouth. The photograph in State's exhibit ten is similar to exhibit nine but was taken from a slightly different angle. Neither photograph shows mutilation caused by the autopsy.

According to Dr. Peerwani, the photographs show "a lot of fluid purging from the nose and mouth. These are all agonal fluids that purge because of pressures that are applied to the body, in this case in the neck area." The photographs also show blood vessels that snapped because of the pressure to Munroe's jugular veins. Thus, the photographs are probative of the cause of Munroe's death—strangulation—that was specified in the State's indictment. *See Saldano v. State*, 232 S.W.3d 77, 101–02 (Tex. Crim. App. 2007) (holding that autopsy

18

photographs were admissible to help illustrate a medical examiner's testimony), *cert. denied*, 552 U.S. 1232 (2008); *King v. State*, 189 S.W.3d 347, 356 (Tex. App.—Fort Worth 2006, no pet.) (holding that an autopsy photograph had probative value because it "directly relate[d] to the medical examiner's testimony that asphyxiation was a possible cause of death, and it d[id] not depict any mutilation resulting from the autopsy"). Finally, although the photographs are somewhat gruesome, they are no more gruesome than the reality of Munroe's murder. *See Narvaiz*, 840 S.W.2d at 429–30.

For these reasons, we hold that the trial court did not abuse its discretion by admitting State's exhibits nine and ten. *See Reese*, 33 S.W.3d at 240–41. We overrule appellant's fourth point.

**DNA items**

In his fifth and sixth points, appellant argues that the trial court erred by admitting a buccal swab kit that contained DNA taken from the inside of appellant's cheek and other various items related to DNA testing. Appellant does not explain how this evidence violated rule 403; instead, he states only, "It was highly prejudicial to admit [the various items of evidence] because the Court did not conduct a balancing test as is required by Rule 403." However, we presume that the trial court conducted a balancing test. *Williams*, 958 S.W.2d at 195–96; *see Rojas v. State*, 986 S.W.2d 241, 250 (Tex. Crim. App. 1998); *Moyer v. State*, 948 S.W.2d 525, 531 (Tex. App.—Fort Worth 1997, pet. ref'd) ("The trial court was not required to

19

announce for the record that it has completed the balancing test in its own mind, but we may imply from the record that a proper balancing test was done.").

Because appellant asserts in his fifth and sixth points only that the trial court did not conduct a balancing test and because we presume that the court conducted one, we overrule those points.[10]

---

[10] We are not required to make other rule 403 arguments on appellant's behalf.  *See Santellan*, 939 S.W.2d at 173.

## Conclusion

Having overruled all of appellant's points, we affirm the trial court's judgment.


TERRIE LIVINGSTON
CHIEF JUSTICE

PANEL:  LIVINGSTON, C.J.; DAUPHINOT and MCCOY, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED:  June 10, 2010